UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARCO A. MICHALSKI, | : | NO.:  3:15-cv-00571 (VAB) |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| CORRECTIONAL MANAGED | : | |
| HEALTH CARE; | : | |
| DR. PETER IMMORDINO; | : | |
| CYNTHIA L'HEUREUX; | : | |
| JANINE AUGUSTO; | : | |
| STEVEN SWAN; | : | |
| YVONNE MARCEAU; | : | |
| DR. FRANKLIN GILLIG; | : | |
| MARY MARTO; | : | |
| DR. RICARDO RUIZ; | : | |
| DR. AUGUSTUS D. MAZZOCCA; | : | All Defendants Are Sued In |
| DR. JOHN D. ROSS; | : | Their Individual Capacities |
| NURSE JANE DOE 1; | : | |
| NURSE JANE DOE 2; and | : | |
| NURSE "SANDEE" | : | |
| | : | |
| Defendants | : | APRIL 6, 2018 |

**SECOND AMENDED COMPLAINT**

Plaintiff MARCO A. MICHALSKI (the "Plaintiff"), by his Court-appointed *pro bono*

counsel, Cohen and Wolf, P.C., hereby alleges as follows upon information and belief:

**PRELIMINARY STATEMENT**

1.     This is a civil rights action brought pursuant to federal statutes and the

United States Constitution in which Plaintiff claims, *inter alia*, that the Defendants, all

medical professionals who were working on behalf of the State of Connecticut at all

times relevant to this action, were deliberately indifferent to his serious medical needs

while he was in the State of Connecticut's custody. The Plaintiff seeks to vindicate his

constitutional rights by seeking monetary, declaratory, and injunctive relief.

**JURISDICTION AND VENUE**

2.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as the action arises under claims brought pursuant to 42 U.S.C. § 1983 and it alleges violations of the Eighth and Fourteenth Amendments to the United States Constitution. Injunctive relief is authorized under Federal Rule of Civil Procedure 65.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims in this action occurred in the District of Connecticut.

4.      Upon information and belief, the Court has personal jurisdiction over the defendants because (a) they are residents of the State of Connecticut; and/or (b) they committed tortious and/or unconstitutional acts within Connecticut.

**PARTIES**

**The Plaintiff**

5.      During the time of the events forming the basis for this action, from approximately April of 2013 until approximately August of 2015, the Plaintiff was confined as an unsentenced inmate to the Corrigan-Radgowski Correctional Institution ("Corrigan CI"), located at 986 Norwich-New London Turnpike, Uncasville, CT 06382. From approximately August of 2015 until March of 2018, the Plaintiff was confined as a sentenced inmate to the Cheshire Correctional Institution ("Cheshire CI"), 900 Highland Ave., Cheshire, CT 06410. The Plaintiff is currently confined as a sentenced inmate to the Osborn Correctional Institution ("Osborn CI"), 335 Bilton Road, POB 11, Somers, CT 06071.

**The Defendants (collectively "the Defendants")**

6.     Defendant Cynthia L'Heureux ("Defendant L'Heureux") is an Advanced Practitioner Registered Nurse ("APRN") who at all times relevant to this Complaint was employed by defendant, Correctional Managed Health Care ("CMHC").

7.     Defendant Janine Augusto ("Defendant Augusto") is a Registered Nurse Practitioner who at all times relevant to this Complaint was employed by CMHC.

8.     Defendant Steven Swan ("Defendant Swan") is a Licensed Practical Nurse who at all times relevant to this Complaint was employed by CMHC.

9.     Defendant Yvonne Marceau ("Defendant Marceau") is a Registered Nurse who at all times relevant to this Complaint was employed by CMHC.

10.     Defendant Dr. Franklin Gillig ("Defendant Dr. Gillig") is a Medical Doctor who at all times relevant to this Complaint was employed by CMHC.

11.     Defendant Mary Marto ("Defendant Marto") is a Registered Nurse who at all times relevant to this Complaint was employed by CMHC. Defendant Marto also serves as the Health Services Administrator for the University of Connecticut Health Center ("UCONN Health Center") and in this capacity, Defendant Marto coordinated medical treatment for inmates such as the Plaintiff who were in the State of Connecticut's custody.

12.     Defendant Dr. Ricardo Ruiz ("Defendant Dr. Ruiz") is a Medical Doctor who at all times relevant to this Complaint was employed by CMHC. Defendant Dr. Ruiz also works at UCONN Health Center and at all times relevant to this Complaint was employed as the facility physician at Cheshire CI. In this capacity, Defendant Dr.

3

Ruiz was at all times relevant to this Complaint the sole physician at Cheshire CI who was responsible for deciding medical grievances, referring inmate patients to be examined by medical specialists, and ensuring that inmate patients receive adequate medical treatment.

13.     Defendant Dr. Augustus D. Mazzocca ("Defendant Dr. Mazzocca") is a Medical Doctor who at all times relevant to this Complaint was employed as an orthopedic surgeon by UCONN Health Center. Defendant Dr. Mazzocca specializes in diagnosis and treatment of musculoskeletal conditions in the human body.

14.     Defendant Dr. Peter Immordino ("Defendant Dr. Immordino") is a Medical Doctor who at all times relevant to this Complaint was employed by UCONN Health Center and who was responsible for treating inmates such as the Plaintiff.

15.     Defendant Dr. John Ross ("Defendant Dr. Ross") is a Medical Doctor who at all times relevant to this Complaint was employed by UCONN Health Center. In this capacity, Defendant Dr. Ross served as an examining physician for inmates such as the Plaintiff.

16.     Upon information and belief, Defendant Nurse Sandee ("Defendant Sandee") is a Registered Nurse who at all times relevant to this Complaint was employed by CMHC and who was stationed at Cheshire CI. In this capacity, Defendant Sandee was responsible for ensuring that all post-operation orders relating to medical care for inmates such as the Plaintiff were carried out properly.

17.     Upon information and belief, Defendant Nurse Jane Doe 1 ("Defendant Doe 1") is a Registered Nurse who at all times relevant to this Complaint was employed by CMHC and who was stationed at Corrigan CI.

4

18.     Upon information and belief, Defendant Nurse Jane Doe 2 ("Defendant Doe 2") is a Registered Nurse who at all times relevant to this Complaint was employed by CMHC and who was stationed at Corrigan CI.

## FACTUAL ALLEGATIONS

19.     Prior to his being incarcerated in April of 2013, the Plaintiff was experiencing considerable pain in his hands, he was examined by an orthopedic surgeon in Norwich, Connecticut (hereinafter "the Norwich Surgeon"), and he was diagnosed with severe carpal tunnel syndrome in both hands.

20.     Prior to the Plaintiff's being incarcerated in April of 2013, the Plaintiff had corrective surgery in 2012 performed by the Norwich Surgeon on his right hand only.

21.     Upon an inmate's admission into incarceration with the Connecticut Department of Correction (the "DOC"), medical staff persons employed by the DOC such as the Defendants are obligated to evaluate all inmates before being approved to enter into the general population of inmates.

22.     At or around the time that the Plaintiff was admitted as an unsentenced inmate to Corrigan CI on or about April 22, 2013, he informed Defendant Doe 1 and/or some of the Defendants that he had been diagnosed with carpal tunnel syndrome in both hands and that his left hand and arm needed to be treated by a medical specialist as soon as possible. More specifically, on April 22, 2013, the Plaintiff informed Defendant Doe 1 and/or some of the Defendants that no more than 6 (six) months prior, he had undergone carpal tunnel relief surgery, and that he had been scheduled to receive surgery on the opposite left hand with the Norwich Surgeon before he had been arrested and subsequently incarcerated.

23.     Despite the Plaintiff's clear communication on or about April 22, 2013 to Defendant Doe 1 and/or some of the Defendants that he had been diagnosed with carpal tunnel syndrome and that he needed to have surgery or other medical treatment performed on his left hand and arm, Defendant Doe 1 and/or some of the Defendants ordered that the Plaintiff be admitted to the general population of inmates at Corrigan CI.

24.     Despite the Plaintiff's clear communication on or about April 22, 2013 to Defendant Doe 1 and/or some of the Defendants that the Plaintiff had carpal tunnel syndrome and that he needed to have surgery or other medical treatment performed on his left hand and arm for this condition, Defendant Doe 1 and/or some of the Defendants did not order that the Plaintiff undergo any surgical procedure on his left hand and arm.

25.     On or about July of 2013, the Plaintiff submitted several administrative remedy requests to some of the Defendants to be treated for his carpal tunnel syndrome. Defendant Marceau met with the Plaintiff on or about July 2013 and during this meeting the Plaintiff indicated to her he wanted to be treated by a medical specialist for his carpal tunnel syndrome. Nevertheless, Defendant Marceau failed to follow up on his request to be seen by a medical specialist.

26.     Thereafter, the Plaintiff wrote another administrative remedy to Defendant Doe 2 and/or some of the Defendants in which he sought to be treated by a medical specialist for his carpal tunnel syndrome. Defendant Doe 2 met with the Plaintiff on or about August of 2013, but failed to follow up on the Plaintiff's request to be seen by a medical specialist.

27.     Through September to November of 2013, the Plaintiff wrote several more administrative remedy requests to some of the Defendants in which he sought to be treated by a medical specialist for his carpal tunnel syndrome. On or about November of 2013, Defendant Augusto met with the Plaintiff, during which she informed him that he would be placed on the "doctor's list" to be examined for his carpal tunnel syndrome.

28.     On or about January of 2014, however, the Plaintiff was seen by Defendant Doe 2, who informed him that he had never been placed on the "doctor's list."

29.     On or about January of 2014, the Plaintiff submitted another administrative remedy form to be seen by an outside specialist for his carpal tunnel syndrome.

30.     On or about February of 2014, as directed by the Defendants, the Plaintiff filled out a release of medical information form so that the Defendants could obtain medical records from the Norwich Surgeon.

31.     Upon information and belief, the Defendants failed to send this medical release form to the Norwich Surgeon and did not retrieve all of the medical records from the Norwich Surgeon that were requested pursuant to the release form.

32.     Over the course of the two years that followed the Plaintiff's April 2013 admission into Corrigan CI, the Plaintiff made the Defendants aware of his diagnosis of carpal tunnel syndrome and of his need to have surgery on his left hand and arm as a result of this serious medical condition.

33.     The Plaintiff filed another administrative remedy on or about March of 2014, alleging the Defendants' continuing failures to treat his carpal tunnel syndrome.

34.     On or about April of 2014, Defendant Dr. Immordino briefly met with the Plaintiff to examine his carpal tunnel syndrome.

35.     Defendant Dr. Immordino allegedly filed a Utilization Review Committee ("URC") request for the Plaintiff to be seen for his carpal tunnel syndrome but the Plaintiff was never examined for his carpal tunnel syndrome in response to this URC request.

36.     Upon information and belief, during this April 2014 meeting, Defendant Dr. Immordino, in conjunction with the alleged filing of a URC, advised the Plaintiff that it was a CMHC policy that unsentenced detainees were always denied specialist medical care.

37.     Defendant Dr. Immordino, despite his evaluation, committed the Plaintiff to file and sign another medical release form to the Norwich Surgeon.

38.     Defendant Immordino thereafter failed to fax, mail, verify, or retrieve the medical data necessary from the Norwich Surgeon to ensure corrective relief to the Plaintiff for his carpal tunnel syndrome.

39.     Defendant Immordino, despite this knowledge, and failure to verify or act, contributed to Plaintiff's manifested risk, and failed to make alternatives available to Plaintiff that would thereby avoid constant pain, unnecessary harm, and further deterioration.

40.     On or about March 2014 through July 2014, the Plaintiff was allegedly placed on the "doctors list" again but was never treated for his carpal tunnel syndrome during this time, despite the Plaintiff's submission of administrative remedies and other requests to be treated.

41.     On or about July 2014, Defendant Augosto met with the Plaintiff, this time accompanied by Defendant L'Heureux.

42.     Defendant Augosto and Defendant L'Heureux prescribed and distributed to the Plaintiff a defective brace without proper support for his left arm and hand during this meeting.

43.     On or about July 2014, Plaintiff met with Defendant Dr. Gillig. Upon his observation of the Plaintiff, Defendant Dr. Gillig determined that a specialist's attention was needed for the Plaintiff's left arm and hand.

44.     During this July 2014 examination, Defendant Dr. Gillig also advised the Plaintiff that the brace that had been given to the Plaintiff by Defendant Augosto and Defendant L'Heureux was ineffective.

45.     Nevertheless, Defendant Dr. Gillig, after this examination, did not follow up on ensuring that the Plaintiff was seen by a medical specialist for his carpal tunnel syndrome.

46.     On or about January 6, 2015, the Plaintiff filed another administrative remedy form in which he requested medical attention for his carpal tunnel syndrome.

47.     Defendant Swan examined the Plaintiff on or about January 24, 2015. At or about this time in January of 2015, Defendant Swan did not have the authority to investigate or deem as withdrawn the Plaintiff's administrative remedy requests as he was not an administrative remedies coordinator or health review coordinator.

48.     At or about this time in January of 2015, Defendant Marto was the head grievance coordinator and was in charge of the final disposition of inmate medical grievances.

49.     Upon information and belief, Defendant Marto never addressed the Plaintiff's January 6, 2015 administrative remedy form, and further never ensured that the Plaintiff was seen by a medical specialist for treatment for his carpal tunnel syndrome.

50.     Despite the Plaintiff's subsequent submission to some or all of the Defendants of numerous medical grievances and administrative requests regarding his need to be seen by a medical specialist for his carpal tunnel syndrome, it was not until on or about October 21, 2015 that the Plaintiff received any formal response to his requests. On this date, Dr. Matthew Imperioli ("Dr. Imperioli"), employed by UCONN Health Center, performed a nerve conduction study and electromyography (EMG) test on the Plaintiff's left arm at the UCONN Health Center (hereinafter "the October 2015 Nerve Exam").

51.     During the October 2015 Nerve Exam, Dr. Imperioli discovered that there was evidence of the Plaintiff's carpal tunnel syndrome in his left arm and Dr. Imperioli concluded, *inter alia*, that the Plaintiff had a severe ulnar mononeuropathy at his left elbow.

52.     As a result of the October 2015 Nerve Exam, Dr. Imperioli recommended to the Defendants that the Plaintiff be referred to an appropriate physician to have surgery—specifically, an ulnar nerve transposition—performed on his left hand and arm. As a further result of the October 2015 Nerve Exam, Dr. Imperioli recommended to the Defendants that the Plaintiff should be provided with an elbow pad to avoid further ulnar compression.

53.     The Plaintiff returned to Cheshire CI from the October 2015 Nerve Exam and shortly after his return, he informed Defendant Sandee that he needed an elbow pad per Dr. Imperioli's recommendation. Despite Defendant Sandee's awareness of this recommendation, however, Nurse Sandee and the Defendants did not take any steps to get the Plaintiff such a pad to protect the nerves in his left arm from further damage.

54.     On or about February 5, 2016, the Plaintiff met with Defendant Dr. Ross. Defendant Dr. Ross told the Plaintiff that surgery would most likely be necessary to correct the condition of his hands and arms in light of his carpal tunnel syndrome. However, the Plaintiff was briefly seen by another doctor prior to leaving, who did not say anything after briefly examining the Plaintiff's hands.

55.     After returning to Cheshire CI, the Plaintiff requested that his records from the October 2015 Nerve Exam be given to him. The Plaintiff then discovered that Defendant Dr. Ross had crossed out his original recommendation, and instead wrote that the Plaintiff did not require surgical intervention.

56.     Defendant Dr. Ross also sent an e-mail to Defendant Dr. Ruiz, instructing him to delete a previous recommendation, and instead state that the case was discussed with Defendant Dr. Mazzocca, and then decided that no surgery was necessary at that time.

57.     Both Defendant Dr. Ross and Defendant Dr. Mazzocca knew that the Plaintiff had severe carpal tunnel syndrome, that he was in a significant amount of pain, that he had had corrective surgery to release the carpal tunnel compression on his right hand and arm prior to being incarcerated in April of 2013, that he had been scheduled

11

to receive surgery on his left hand and arm prior to being incarcerated in April of 2013 but was hindered from receiving this surgery as a result of his being incarcerated, and that if left untreated, he risked permanent disfigurement and disability.

58.     Despite the fact that the Plaintiff told Defendant Dr. Ruiz that he had worn several wrist splints in the past but that they were completely ineffective, Defendant Dr. Ruiz prescribed the Plaintiff with a wrist splint.

59.     On or about February 16, 2016, the Plaintiff submitted a medical grievance, also known as a Health Services Review (HSR), seeking redress of the Defendants' decision to give the Plaintiff a wrist splint rather than surgery that was deemed necessary by two physicians.

60.     The Plaintiff's February 16, 2016 HSR was returned without disposition, which is not an acceptable response to an HSR pursuant to, *inter alia*, Administrative Directive 8.9.

61.     The Plaintiff again submitted an HSR on February 22, 2016, alleging that he was receiving improper treatment.

62.     On March 9, 2016, the Plaintiff met with Defendant Dr. Ruiz for an HSR appointment. The Plaintiff submitted a request for a telemedicine video conference with orthopedic specialists.

63.     On or about April 8, 2016, the Plaintiff met with Defendant Dr. Ruiz and Defendant Dr. Mazzocca for a telemedicine video conference. During this conference, possible treatments were discussed including two different surgical procedures. Defendant Dr. Mazzocca discussed the simpler ulnar nerve decompression procedure and the more complex ulnar nerve transposition procedure with the Plaintiff, as well as

the risks associated with both. Defendant Dr. Mazzocca also opined to the Plaintiff that because the damage to the Plaintiff's ulnar nerve and because of the extent of atrophy to the muscles in his left hand and arm was so great, the decompression procedure would be ineffective.

64.     On or about May 6, 2016, the Plaintiff again met with Defendant Dr. Ruiz for a telemedicine video conference with Defendant Dr. Mazzocca.

65.     During this May 6, 2016 telemedicine conference, the Plaintiff agreed to receive an ulnar nerve transposition, as well as a median nerve release or decompression (a carpal tunnel release).

66.     On or about June 8, 2016, the Plaintiff was transported to UCONN Health Center for his surgical procedures. The Plaintiff was approached by one of the attending surgeons, who was not Defendant Dr. Mazzocca, who asked the Plaintiff a series of questions to identify the correct patient, and to mark and identify the extremity, then was taken to the operation room, where he underwent general anesthesia and surgery.

67.     The Plaintiff then awoke in a recovery room and was transported back to Cheshire CI without again seeing any surgeon for post-operative care.

68.     Upon returning to Cheshire CI from any visit to UCONN Health Center, an inmate must report to the medical unit at their facility to go over any prescriptions, orders from specialists, and other items relating to the visit.

69.     When the Plaintiff returned to Cheshire CI from his June 8, 2016 visit to UCONN Health Center, he met with Defendant Sandee.

70.     The Plaintiff and Defendant Sandee discussed post-operative care needs and prescriptions and Defendant Sandee prescribed the Plaintiff with Aspirin to prevent blood clots twice daily, oxycodone (5mg) tablets for every 4 hours for 7-10 days, and Tylenol for pain for 2-3 weeks.

71.     Defendant Sandee stated during this meeting that there was no way that the Plaintiff would be receiving oxycodone. The Plaintiff said that he was in severe pain and would need them as he had just undergone two surgical procedures. Defendant Sandee stated that she would give the Plaintiff Tylenol and Codeine instead.

72.     Defendant Sandee is a nurse, not a physician, and altering or writing prescriptions is not within her authority.

73.     By prescribing a weaker pain medication knowingly and maliciously, Defendant Sandee wantonly inflicted unnecessary pain on the Plaintiff.

74.     Since his May 6, 2016 telemedicine conference with Defendant Dr. Mazzocca and Defendant Dr. Ruiz, the Plaintiff was led to believe that he would be receiving ulnar nerve transposition surgery, which is what he had consented to receive.

75.     Shortly after his June 8, 2016 surgery, the Plaintiff wrote to the Medical Records division of the DOC to obtain copies of any documents generated regarding the surgery.

76.     Upon the Plaintiff's receipt of the documents pertaining to his June 8, 2016 surgery sometime after this request, he discovered that he had not received the ulnar nerve transposition procedure that he was told he would receive and to which he had consented. Instead, the Plaintiff learned that he had received the simpler ulnar nerve decompression procedure that was known to be ineffective.

14

77.     After the June 8, 2016 surgery, the Plaintiff began regularly experiencing "electric shock-like" sensations that started in his inner elbow and emanated down his forearm to the tips of his fingers.

78.     The Plaintiff was seen at sick call on or about June 27, 2016.

79.     After making numerous requests to staff members at Cheshire CI to be seen for the pain in his left arm, the Plaintiff was seen by Defendant Dr. Ruiz on August 8, 2016, who merely told the Plaintiff to "baby" his left arm.

80.     After several more requests to staff members at Cheshire CI to be seen for the pain in his left arm, the Plaintiff met with Defendant Dr. Ruiz and Defendant Dr. Mazzocca for a telemedicine conference on or about October 27, 2016.

81.     During this telemedicine conference, Defendant Dr. Mazzocca told the Plaintiff that he should have been "abusing" his left arm to desensitize it, rather than "baby" it as Defendant Dr. Ruiz had told him to do during his August 8, 2016 meeting with the Plaintiff.

82.     The Plaintiff asked Defendant Dr. Mazzocca why he had received the ulnar nerve decompression surgery rather than the ulnar nerve transposition surgery. Defendant Dr. Mazzocca told the Plaintiff during this conference that the procedures were the same, despite the fact that he had told the Plaintiff that the procedures were different in terms of effectiveness during at least two previous telemedicine conferences.

83.     The Plaintiff subsequently submitted numerous additional requests to staff members at Cheshire CI to be seen for the severe pain that he was experiencing due to his carpal tunnel syndrome, to no avail.

84.     On or about May 8, 2017, the Plaintiff submitted another HSR to the staff members at Cheshire CI, claiming that he had received improper surgical treatment on June 8, 2016, and that he was still in an immense amount of pain.

85.     On or about June 14, 2017, the Plaintiff met with Defendant Dr. Ruiz for an HSR appointment, and at this meeting, the Plaintiff submitted a request for a telemedicine conference with orthopedic specialists.

86.     On or about August 4, 2017, the Plaintiff again met with Defendant Dr. Ruiz and Defendant Dr. Mazzocca for a telemedicine conference.

87.     During this August 4, 2017 telemedicine conference, the Plaintiff asked Defendant Dr. Mazzocca if he in fact had performed the surgery on June 8, 2016, to which he responded in the affirmative. The Plaintiff next asked Defendant Dr. Mazzocca why his name was not signed on any of the paperwork documenting the surgery and why instead a Dr. Ziegler had signed the documents. Defendant Dr. Mazzocca responded that this was a "huge error." Also during this telemedicine conference, the Plaintiff asked Defendant Dr. Mazzocca why he had undergone an ulnar nerve decompression when the Plaintiff had only consented to undergo an ulnar nerve transposition. Defendant Dr. Mazzocca responded that he never would have agreed to perform an ulnar nerve transposition on the Plaintiff, despite the fact that he had told the Plaintiff during previous telemedicine conferences that the ulnar nerve decompression procedure would be ineffective in the Plaintiff's case because of the severity of the Plaintiff's carpal tunnel syndrome and that he had understood the Plaintiff had consented to receive an ulnar nerve transposition, not an ulnar nerve decompression. At the conclusion of this telemedicine conference, the Defendant Dr.

16

Mazzocca told the Plaintiff that there was nothing more that he could do for the Plaintiff except order another nerve conduction study.

88.     Being skeptical of Defendant Dr. Mazzocca's inconsistent statements in previous telemedicine conferences, on or about June 29, 2017, the Plaintiff requested from UCONN Health Center the transcripts and/or recordings of all telemedicine conferences that he had had in 2016 with Defendant Dr. Mazzocca.

89.     On or about July 10, 2017, the Plaintiff received a response from the correspondence coordinator at UCONN Health Center that no such records existed.

90.     On or about September 7, 2017, the Plaintiff was transported to UCONN Health Center for an EMG test and a nerve conduction study (hereinafter "the September 2017 Nerve Exam"). The September 2017 Nerve Exam revealed that there was further damage to the ulnar nerve in his left arm as well as intensification of carpal tunnel syndrome in his left arm.

91.     Since the June 8, 2016 surgery, to this date, the Plaintiff has written numerous requests and medical grievances to the Defendants in which he has requested to be seen by medical specialists for the pain stemming from his carpal tunnel syndrome, but the Plaintiff has not received any meaningful response from the Defendants.

92.     Had the surgical procedures to which the Plaintiff consented been performed rather than a procedure known to be ineffective, the Plaintiff would not have been subjected to unnecessary pain, suffering and scarring.

93.     On a daily basis, the Plaintiff has, *inter alia*, "pins-and-needles-like" sensations emanating from his left elbow to his left hand and to his neck, throbbing

pain in his left inner elbow, cramping and clawing or involuntary in-turning of the digits in his left hand, and throbbing pain into the inner elbow/bicep area of his left arm. Furthermore, the Plaintiff cannot apply any pressure at all to his left elbow without a severe "funny-bone" sensation, burning sensation in the palm and thumb area of his left hand, a tearing feeling at the inner elbow while extending his left arm, hands falling asleep almost instantly with his left arm in a closed position or any pressure being applied to his forearm, and a stinging sensation at the tip of his left elbow. As a result of this daily and severe pain, the Plaintiff is unable to sleep and perform daily tasks on a regular basis.

94.     In addition to these severely painful sensations, the Plaintiff suffers from, *inter alia*, severe muscle atrophy and permanent disfigurement in his left hand, resulting in his inability to exert any grip strength and his loss of range in motion in his left hand.

## CLAIM FOR RELIEF

## FIRST COUNT

**Deliberate Indifference and Failure to Provide Adequate Medical Care In Violation of the Eighth Amendment to the United States Constitution (as to all Defendants)**

95.     Paragraphs 1-94 are incorporated as if set forth fully herein.

96.     The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

97.     As alleged above, the Defendants at all relevant times knew that the Plaintiff's diagnosis with carpal tunnel syndrome was a serious medical need.

18

Specifically, since being admitted into the custody of the DOC on or about April 22, 2013, the Plaintiff has communicated to some or all of the Defendants that he experiences severe pain and physical dysfunction on a regular basis as a result of his carpal tunnel syndrome, and that he needs to seen by an outside medical specialist for his carpal tunnel syndrome. As such, the Plaintiff's carpal tunnel syndrome is a serious medical need.

98.     The Defendants have known at all relevant times about the Plaintiff's carpal tunnel syndrome and its nature of being a serious medical need since he was admitted as both an unsentenced and sentenced inmate into Corrigan CI on or about April 22, 2013, and thereafter to Cheshire CI.

99.     At all times relevant to this complaint, the Defendants have known about the numerous medical grievances and other written requests submitted by the Plaintiff to be seen by an outside medical specialist in order to be treated for his carpal tunnel syndrome, particularly as it affects his left hand and arm.

100.    Despite the Defendants' knowledge, they have consciously disregarded the Plaintiff's requests and have failed to ensure that he is seen by a medical specialist for his carpal tunnel syndrome, and further that he receives the proper surgical treatment on his left hand and arm.

101.    At all times relevant to this Complaint, the Defendants' acts and omissions have proximately caused harm to the Plaintiff, specifically causing him to suffer severe and debilitating pain on a daily basis since being admitted into prison on or about April 22, 2013, thereby subjecting him to cruel and unusual punishment.

102.    At all times relevant to this Complaint, the Defendants have acted under color of law.

103.    As a result of the Defendants' actions and omissions, the Plaintiff requests an award of nominal, compensatory, and/or punitive damages in an amount to be established at trial.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

104.    Paragraphs 1-103 are incorporated as if set forth fully herein.

105.    The Plaintiff beyond all doubt has exhausted his administrative remedies before making any attempt to bring this action before this Court.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiff hereby demands trial by jury of all issues properly triable thereby.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff respectfully requests that the Court grant the following relief and enter judgment as follows:

1. Granting the Plaintiff's request for an award of nominal, compensatory and/or punitive damages in an amount to be established at trial, as requested in the First Count.

2. Ordering a permanent and final injunction prohibiting the Defendants and their successors in office, from infringing the Plaintiff's as conferred by the Eighth Amendment to the United States Constitution, and further ordering the Defendants to arrange immediately for the Plaintiff to be evaluated and treated by a medical specialist outside of the CMHC and DOC for his carpal tunnel syndrome.

3. Issuing a Declaratory Judgment stating that all of the Defendants.

4. Granting Plaintiff an award of attorney's fees pursuant to 42 U.S.C. § 1988(b).

5. Granting such other relief as it may appear that the Plaintiff is entitled to.

THE PLAINTIFF,
MARCO A. MICHALSKI

By:____/s/_____
Joseph D. Szerejko, Esq. (ct30160)
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT  06604
T:  (203) 337-4175
F:  (203) 337-5575
E-mail: jszerejko@cohenandwolf.com

## **CERTIFICATION**

I hereby certify that on this date, a copy of foregoing SECOND AMENDED COMPLAINT was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by U.S. Mail to as indicate on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


_____/s/ ct30160_____
Joseph D. Szerejko